---

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

---

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

KEVIN DAVIS and ANTOYNE V. GILL,

               Defendants.

**ORDER**

**Case No.  2:05CR483DAK**

---

       This matter is before the court on Defendants Kevin Davis' and Antoyne V. Gill's Motion to Suppress evidence.  An evidentiary hearing on the motion to suppress was held on December 12, 2005.  Defendants appeared and were represented by Robert Steele and Candice Johnson.  Plaintiff was represented by Veda Travis.  The court held closing arguments on the motion on February 9, 2006.  At closing arguments, Plaintiff was represented by Veda Travis, Defendant Gill waived his right to attend but was represented by Candice Johnson, and Defendant Davis was present and represented by Robert Steele and Brian Williams.  The court has carefully considered the evidence presented at the hearing, the memoranda submitted by counsel, and the law and facts relating to this motion.  Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

**A. FINDINGS OF FACT**

Steve Salas has been employed with the Utah Highway Patrol for seven years and is currently assigned to the criminal interdiction team.  Salas is also a K-9 handler.  Salas has served on the interdiction team for three years and has been a dog handler for two.

In connection with his assignment on the interdiction team,  Trooper Salas has received specialized training in narcotics interdiction, including approximately 100 hours of training in criminal drug trafficking and pipeline interdiction. In the pipeline interdiction training, Salas has attended classes regarding 1) areas where controlled substances come from, 2) areas drugs go to, 3) how drugs are transported in vehicles, 4) hidden compartments and how to detect those compartments, 5) questions to ask during pipeline traffic stops, 6) vehicle indicators of drug trafficking and 7) subject indicators of drug trafficking.

Trooper Salas also has been certified by POST as a K-9 narcotics detection handler. Trooper Salas' dog is a 10-year-old Belgian Malinois named Claudio. Claudio has served with the Highway Patrol for approximately eight years.  Claudio is trained and certified as a narcotics-detection dog and as a patrol and apprehension dog.  Claudio has been certified by Utah POST in detecting the odors of marijuana, cocaine, heroin and methamphetamine, and receives weekly, ongoing training. When Claudio detects the odor of a narcotics, his regular sniffing pattern changes.  He then focuses on a specific area, and once he indicates, he will scratch with his front paws, bark or bite.  Claudio is known as "an aggressive indicator."  Salas considers Claudio to be a reliable dog.

On May 18, 2005, at approximately 11:20 a.m., Trooper Salas was patrolling I-70 in

Emery County.  In Salas' training and experience, I-70 has been designated as a drug trafficking route.  As Trooper Salas was traveling eastbound on the highway, he observed a black-colored car traveling ahead of him.  Salas noticed that the car had a rear California license plate with an expiration year of 2001.  Salas also noticed there was a piece of paper in the lower driver's side rear windshield. Salas could not read the print on the piece of paper.  Trooper Salas did not believe that the paper was a temporary permit because the California temporary permits he has seen have been placed in a packet on the inside of the front windshield, in the lower right corner. Salas has also not seen California cars with both license plates and temporary stickers.

Salas was also suspicious of the plate and temporary permit because if the car been sold with the license plate still on it, the car would have been sitting in a lot since 2001, the date on the license plate.  Based on his suspicions, Trooper Salas stopped the car and approached on the passenger side.  He made contact with two male occupants and told the driver that the license plate was expired.

The driver told Salas he had a temporary sticker in the rear window.  Salas then explained that he could not read the print on the paper and that he had never seen a temporary permit along with an expired license plate.  The driver told Trooper Salas that he had been stopped earlier and that the officer had told him to remove the license plate because it was expired.  The driver said that he had not removed the plate because he did not have an Allen wrench.

Trooper Salas asked the driver for his license.  The driver provided Salas with a California license in the name of Kevin Davis.  Salas then asked the occupants where they were going and they said they were going to a family reunion in St. Louis, Missouri.  Trooper Salas

3

asked about the ownership of the car.  The passenger said that he owned the car, but that the driver had given him money for the vehicle.  Trooper Salas asked for the vehicle registration.

As the occupants began looking for the registration, Salas noticed a bottle of air freshener in the passenger door.  He also noticed what appeared to be a bottle of Visene in the front driver's door.  In Trooper Salas' training and experience, air fresheners can be used to mask the odor of narcotics, while Visene is used by drug users to remove the redness from their eyes. Salas also noticed that the driver, Kevin Davis, had multiple tattoos on both arms which Salas thought were gang tattoos because they were in black ink.  In Salas' training and experience, gang members are involved in transporting narcotics because narcotics are used to finance gang activities.

Davis and the passenger provided Trooper Salas with a purchase agreement for a 1992 Acura; the agreement was in the name of Kevin Davis and Antoyne Gill.  The agreement indicated that the car had been purchased on April 6, 2005.  Trooper Salas asked the passenger what the year of the vehicle was and the passenger said he did not know. Salas found that odd because most people who have purchased a used car know the year of the vehicle.  Salas responded saying, "You don't know what year it is and you bought it?"  He then asked if the passenger had purchased the car from a dealer.

The passenger, who had claimed ownership of the car, did not have identification. Trooper Salas asked him to come back to his patrol vehicle in order to ask the passenger additional questions about the vehicle.  Salas had concerns about the validity of the license plate and the paper in the rear window, and concerns that the license plate was stolen.  He was also suspicious that the vehicle might be stolen.

4

When the passenger got into Trooper Salas' car, the trooper asked if the license plate had been on the vehicle when he purchased the car.  The passenger said it was.  The passenger also said that the temporary permit was issued to him when he purchased the vehicle.  The passenger stated that the dealer had said he would have to come back for the tags.  Because the passenger had previously told Trooper Salas that the driver, Kevin Davis, had given him money for the car, Salas asked the passenger if he and Davis lived together.  Salas thought that if they had purchased the vehicle together, they would both want to use the vehicle, indicating that they lived together.  The passenger said they did not live together. Trooper Salas then asked the passenger why he had purchased a car with someone he didn't live with and the passenger said that he and Davis purchased the car together because they would be traveling back and forth to St. Louis.  Salas asked the passenger if he had another vehicle and the passenger said he did not. When Salas asked if Davis had another vehicle, the passenger replied that Davis used his father's Cadillac. The passenger told Trooper Salas that he and Kevin Davis were cousins.

Trooper Salas asked the passenger further questions about the family reunion. Salas asked if the passenger had children and the passenger said he did.  When Salas asked why he was not taking the children to the reunion, the passenger said the children were with their mother.  Salas also asked if  Davis had children and why he was not taking his children to the reunion.  The passenger said that Davis had children, but he did not know why he had not brought his children along to the reunion.  The passenger told Trooper Salas that the family reunion was with his father's family, but that his father was not attending.  The passenger also said that he was looking forward to seeing his cousin.

Trooper Salas asked the passenger if he had a license with him, whether he had any

warrants and whether he was wanted.  Trooper Salas asked questions of the passenger because he wanted to verify that the passenger and the driver were authorized to have the car.  Salas wanted the passenger to provide him with information to clarify whether the vehicle was properly registered, whether it belonged to the passenger or whether it was stolen. While Salas was talking with the passenger, he contacted dispatch to run the license plate, the vehicle, a driver's license check, a warrants check, and a criminal history check on Davis.

Salas asked the passenger for his name and the passenger identified himself as Antoyne Gill.  Salas then began filling in information on his computer screen which could be used to create either a warning or a citation.  As Trooper Salas was preparing the information on his computer, he continued to talk with Gill.  Salas asked Gill where he and Davis had been stopped earlier in the day.  Gill said they had been stopped north of Las Vegas and volunteered they had been stopped for the same reason he had been stopped on a previous trip.

When Salas asked about the previous trip, Gill told him that he had gone to Missouri approximately three weeks ago to visit family.  Gill said that he had been stopped in Missouri and the officer had told him that the plate on the car was expired.  Salas found Gill's statements odd. because he did not think it was cost effective to travel to Missouri to visit family when a family reunion was scheduled only three weeks away.  Salas also thought it was suspicious that Davis had to loan Gill money to purchase a vehicle--with 170,000 miles on it and which likely cost only $3000--but Gill was making multiple trips in a short time period from Los Angeles to Missouri.

Salas asked Gill if he was working.  Gill said he was working construction for C.J. Evans Company and had previously worked for a company by the name of Dixieline.  Salas asked Gill

where Davis worked and Gill said he did not know.  Salas found it odd that Gill did not know where Davis worked in light of the fact that they were allegedly cousins who were traveling a long distance together and Gill had borrowed money from Davis to purchase the car.

Trooper Salas asked Mr. Gill where the family reunion was being held and Gill said it was being held in a convention center in downtown St. Louis. Salas found it strange that a family reunion was being held in a convention center.  Trooper Salas asked Mr. Gill if he had been to St. Louis before and Gill said he had.  Gill said he had gone there to visit his cousin when his cousin was released from prison.

As Trooper Salas was filling out information on the computer screen, he came to the space to list the year of the vehicle.  Salas again asked Mr. Gill for the year of the car and Gill said, "It's an 82."  He quickly followed up saying, "I think it's a 92."  Dispatch then reported to Trooper Salas that Kevin Davis had a valid driver's license out of California, but that he possibly had a criminal history.  The dispatcher asked Salas if he had a social security number for Davis; Salas advised that he would try to get that information.  Salas then asked another trooper who had arrived on the scene, Trooper Coleman, if he would ask Davis for his social security number.

Salas then asked Mr. Gill if Davis was wanted for anything and Gill said he did not know.  Trooper Coleman approached Davis and obtained a partial social security number which Salas relayed to his dispatcher.  Salas found it suspicious that Davis did not provide his entire social security number and thought that Davis was intentionally withholding the information. Salas returned Gill's information to him, including the purchase agreement, and issued him a warning citation.  He then explained that he was waiting for a check to be completed on Davis.

While waiting, Salas asked Gill about who used the car he and Davis had purchased

together.  Gill said that he used the car and that Davis did not use it.  Salas asked Gill where he and Kevin Davis were staying in St. Louis.  Gill said they were staying at a hotel.  When Salas asked what hotel, Gill said any hotel that had an available room.  Salas then asked Gill if he would agree to sit in the patrol car while he spoke with Davis. Gill agreed to stay in the patrol car.

Salas then approached Davis and returned his driver's license.  Salas asked Davis if he was wanted for anything and he said he was not.  Salas then asked Davis if he had ever been arrested and Davis said he had been arrested for fighting.  Salas asked if Davis had ever been arrested for drugs or weapons and he said he had not.

Salas then asked Mr. Davis if he could ask him a few questions about his travels.  Davis stated that he had already been harassed.  Salas explained that he was not harassing him; he just wanted to know if Davis knew where the family reunion was being held.  During this exchange, Mr. Davis would not look at Trooper Salas.  He appeared to be frustrated and angry, but did not refuse to talk with Salas.  Davis told Salas that the reunion was in St. Louis and said that he and Gill were going to stay with family.  Salas said, "You're going to stay with family" and Davis replied, "or a hotel."  Trooper Salas also asked Davis where Gill worked and Davis said he worked at Dixieline.  When Salas asked Davis where he worked, Davis said he did his music.

Salas returned to his patrol car, and was contacted by his dispatcher.  The dispatcher told him that Kevin Davis had a criminal history for drug arrests, armed robbery and theft.  Salas then asked Gill if there were any weapons in the vehicle, or any marijuana, cocaine or heroin.  As he was asking, the dispatcher informed Salas that the vehicle had not been reported as stolen, but that the car was registered to a Deborah Nay, and the registration had expired in January, 2005.

8

Salas then asked Gill if he knew a Deborah Nay and Gill indicated he did not. The fact that the car had not been reported as stolen did not dispel Salas' suspicion that the car might be stolen.

Salas again asked Gill if there were any illegal drugs in the vehicle or any large amounts of cash, and Gill said there were not.  Salas then told Gill that he would like to search the vehicle to make sure there were no illegal drugs and asked Gill if that was okay with him. Gill said, "No problem."  Trooper Salas then explained that he would have Gill step off to the side of the highway while he searched.  He then asked Gill if he could put his police dog inside the car and Gill again said, "no problem."  Salas then asked Mr. Gill step out of the car and go to the front of the car where he asked Gill if he could see his waistband "real quick" as a check for weapons. Gill agreed.

Salas then approached Davis and asked him if there was anything illegal in the vehicle. Davis said there was not.  Salas then explained that Gill had agreed to allow him to search and to use the K-9, and asked Davis if he had any objections to that.  Davis said, "well it's his vehicle."  Davis appeared to Salas to be grabbing his shoes and Salas asked where the shoes were.  Davis indicated the shoes were in the back seat.  Davis asked Salas, "What if I say no?" Salas asked Davis if he had any belongings in the car which he did not want Salas to search.

Davis then got out of the car and got his shoes out of the backseat.  Davis walked to the front of Salas' car; Salas then approached Davis and asked, "Do you have any bags or belongings that you do not want me to search?"  Davis indicated he had a bag and Salas asked if Davis cared if he looked through his bag; Davis agreed to allow Salas to search the bag.  Salas asked what color the bag was and Davis said the bag was green.  Trooper Salas then asked Davis to lift his shirt; Salas did a quick pat-down.  Salas asked Davis if he would stand on the side of

9

the interstate while Salas searched.  Davis agreed.

Salas then deployed Claudio to search the car.  While Claudio was inside the passenger compartment, he indicated on a white box on the back seat.  Salas looked in the box, but did not locate any contraband.  Salas continued to search, and deployed Claudio in the trunk.  As Claudio was sniffing the left side of a speaker box, he indicated on the box.  Salas then removed Claudio from the trunk.  Trooper Salas got a screwdriver and began removing the left speaker from the speaker box.  Salas noticed a depth discrepancy which led him to believe, based on his training and experience, that there was a hidden compartment built into the back of the speaker box.

Salas told Davis and Gill that the dog had indicated for the presence of narcotics.  Davis then commented to Gill that the reason the dog had indicated was because of all the dope Gill had smoked.  Gill agreed that was probably the reason for the dog's indication.  Salas asked Mr. Gill if the speaker box was his and Gill said it was.  Salas then asked Gill if he could drill a hole in the box; Gill then looked at Davis and commented that Salas wanted to drill a hole.  Salas then commented, "I thought this was your box" and Gill said that Davis had it made for him.

Salas went to the trunk of his patrol car to get a drill.  While there, Gill approached him and handed Salas a clear plastic bag containing what appeared to be marijuana.  Gill told Salas that the marijuana had been in the white box on the back seat which Claudio had indicated on earlier.  Gill also told Salas that he had moved the marijuana from the box to his shoe after they had been stopped near Las Vegas.

Salas drilled into the speaker box; when he removed the drill bit, there was material on the bit which Salas believed to be some type of packaging.  Salas drilled another hole and then

10

used a screwdriver to push into the box.  When Salas removed the screwdriver, it was covered with a white, powdery substance which appeared to be cocaine.

Salas arrested Davis and Gill and they were transported to the Emery County Sheriff's Office. While Salas was transporting Gill to that location, Gill told Salas that Davis did not know there were drugs in the car.  Gill stated that he was working for a California street gang and that he was being paid approximately $5000 to transport the drugs.  Salas then asked Gill if Gill knew what was in the box, and Gill said he thought the box contained high-grade marijuana. Salas' had not advised Gill of his rights under *Miranda* prior to asking that question.

Trooper Salas seized the temporary sticker which had been on the vehicle and examined it.  The sticker was different than other California temporary stickers Salas had seen in that the seized sticker was handwritten while the other stickers Salas has seen have been typed.  The VIN listed on the temporary sticker matched the VIN listed on the purchase agreement.  That VIN, however, did not match the actual VIN on the vehicle.  The first character on the vehicle is a "J" whereas it is a "1" on the purchase agreement and temporary permit.

On the date of the evidentiary hearing, December 12, 2005, Salas ran the vehicle registration by the VIN on the vehicle and found that the vehicle was registered to a Deborah Nay, the same individual who had been listed as the registered owner on May 31, 2005, when Trooper Salas ran the license plate number.  In Salas' experience, if the vehicle had been purchased by Davis and Gill as claimed, the registration should have come back to Davis and Gill.

Also on December 12, 2005, in preparation for the evidentiary hearing, Salas ran a registration check using the VIN listed on the purchase agreement. That registration came back

11

as "not on file." The purchase agreement for the car showed that the seller was TNT Auto Sales. In a block listed as "license number," no license plate number was listed. The purchase agreement also showed $130 paid as having been paid for registration fees, indicating that the vehicle should have been registered by the dealer with the new owner information.

The insurance card seized by Trooper Salas showed the insurance company of State National Insurance Company and was in the name of Antoyne Gill. The VIN on the insurance card is the correct VIN of the car driven by Kevin Davis on May 31, 2005.

## II. CONCLUSIONS OF LAW

### I. Legality of Stop and Detention

The reasonableness of a traffic stop is analyzed under a two-prong analysis set forth in *Terry v. Ohio*, 392 U.S. 1, 20 (1968). A court must first determine whether the stop was justified at its inception, and second, whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

#### A. Reasonable Suspicion for Stop

A traffic stop is valid under the Fourth Amendment so long as the officer has either observed a traffic or equipment violation or has reasonable suspicion that such a violation has occurred or is occurring. *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). In assessing whether reasonable suspicion existed for the traffic stop, the Tenth Circuit has stated:

> Reasonable suspicion requires that an officer provide some minimal level of objective justification. However, an officer with reasonable suspicion need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a particularized and objective basis for a traffic stop. Moreover, reasonable suspicion may be supported by an objectively reasonable good faith belief even if premised on factual error.

> Finally, reasonable suspicion may rely on information less reliable than that required to show probable cause and it need not be correct.

*United States v. Vercher*, 358 F.3d 1257, 1261 (10th  Cir. 2004) (citations omitted).

In the instant case, the license plate on the vehicle was expired.  Moreover, although Trooper Salas saw a piece of paper on the rear window, the paper was not consistent with the California temporary permits he had seen.  The temporary stickers Salas had seen were folded and placed in a plastic packet inside the passenger side of the front window. The paper on defendants' car appeared to Salas to have been placed on the outside of the driver's side of the rear window and was unfolded. Salas also testified that he had never seen a California vehicle displaying both a license plate and a temporary permit.  As a result of these observations, at the time of the stop, Salas was not sure that the paper on defendants' car was in fact a temporary permit.

In attacking Trooper Salas' reason for the stop, Davis submitted section 4606 of the California traffic code which establishes that license plates are to be left on used vehicles at the time of sale if the plate is "from the previous registration year." The statute, however, applies to license plates that are from the previous registration year and the license plate in this case had a "2001" sticker.  Even if Salas had known of the California statute, he would have had reasonable suspicion to stop the vehicle to inquire why a 2001 license plate was still on the car.

Moreover, the Tenth Circuit has stressed that "it is not our role to decide whether the present facts are adequate to affirm a conviction under the applicable ... traffic statute," but rather, to "inquire solely as to whether the facts are adequate to form an objectively reasonable suspicion" that the statute was being violated. *Vercher*, 358 F.3d 1257, 1260 (10th Cir. 2004).

Salas did not think that the piece of paper he saw in the rear window was a temporary permit based on his experience with California cars.  Salas had a good faith belief  that there was a problem with the registration. *See Vercher*, 358 F.3d at 1261.  The stop, therefore, was reasonable and justified at its inception.

**B. Scope of the Stop.**

In addressing the second prong of the Terry analysis, whether the detention was reasonably related to the scope of the traffic stop, the Tenth Circuit has recognized that an officer conducting a routine traffic stop may run computer checks on: 1) the driver's license, 2) the vehicle registration, 3) other proof of authorization to operate the vehicle, 4) outstanding warrants on the driver, and 5) whether the vehicle has been reported stolen. *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997); *see United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003). Moreover, an officer may detain the driver and vehicle as long as reasonably necessary to make these determinations or to issue a citation or warning.  *Mendez*, 118 F.3d at 1429.

Salas did not impermissibly detain the defendants or exceed the scope of the stop.  The record before the Court establishes that during the initial detention of the defendants,  Salas was trying to determine the defendants' legal authority to possess the car.  During the first four minutes of the stop, Salas was at the car asking for Davis' driver's license and  following up on questions regarding the ownership of the car.

Salas also asked defendants about their travel plans, a topic that has been found by the Tenth Circuit to be within the scope of a routine traffic stop. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (stating that "questions about travel plans are routine and may be

14

asked as a matter of course without exceeding the proper scope of a traffic stop); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989) (indicating that questions may be asked of both driver and passengers).

The evidence also establishes that after Gill returned to Salas' patrol car, Salas continued to ask questions related to whether Davis or Gill had lawful possession of the car. Salas then ran warrants and other checks with his dispatcher. While waiting for that information to return, he continued to talk with Gill. During that time, the following events occurred:

1. Approximately 6-7 minutes after Salas' request to dispatch, the dispatcher asked Salas if he had a social security number for Davis. After Salas asked Trooper Coleman to get Davis' social security number, dispatch reported to Salas that there was a possible Triple I match on Davis. Within a minute or so, Salas provided the dispatcher with a partial social security number which Trooper Coleman had obtained from Davis.

2. Immediately after that, Trooper Salas printed out the warning citation for Gill, gave him the warning and returned all of his documents. Salas then explained to Gill that he was waiting for additional information on Davis. Salas then asked Gill additional questions related to the vehicle's ownership and the family reunion. Salas then asked Gill if Gill would stay in his patrol car while he talked to Davis; Gill agreed.

3. Trooper Salas then approached Mr. Davis and asked him several questions. Although Davis was hostile, he answered Salas' questions. Salas then returned to his patrol car.

4. After Trooper Salas returned to his car, the dispatcher reported that Kevin Davis had priors for drugs, armed robbery and theft. Dispatch then reported that the car was registered to a Deborah Nay, with an expiration date of January 2005. Salas asked Gill if he knew Deborah

Nay.  He then asked Gill for consent to search the car.

The videotape establishes that Salas detained defendants for 18 minutes from the time of the stop until the time dispatch returned all of the information that Salas had requested.  During that period, the record establishes that Salas asked about travel plans and was attempting to determine whether defendants had a lawful right to the car.  He was also trying to determine whether the driver, Davis, had a valid driver's license and any outstanding warrants.

Moreover, Salas' questioning occurred while he was waiting for information to return from dispatch. "[A]s long as the trooper's questioning did not extend the length of the detention,... there is no Fourth Amendment issue with respect to the content of the questions." *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005) (citing *Muehler v. Mena*, 125 S. Ct. 1465, 1471 (2005) (holding that where detention is not prolonged by questioning, no additional seizure occurred within the meaning of the Fourth Amendment)).

During the evidentiary hearing, the defense elicited testimony that the Triple I usually required more time for dispatch to run, implying that the Triple I was beyond the scope of the stop. The evidence shows, however, that in this instance, the Triple I was obtained by dispatch prior to the registration information. The Triple I request by Trooper Salas was also reasonable in light of the tattoos Salas saw on Davis' arms which he believed to be gang tattoos.  The scope of the detention, therefore, was reasonable.

**D.  Reasonable Suspicion to Detain Defendants and to Ask for Consent to Search.**

The government argues that once Trooper Salas returned defendants' documents to them, the encounter between the trooper and defendants became consensual.  *See United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005); *United States v. West*, 219 F.3d 1171, 1176 (10th

16

Cir. 2000). "A stop generally ends when the officer returns the driver's license, registration, and insurance information." *United States v. Werking*, 915 F.2d 1404, 1406 (10th Cir. 1990). Additional questioning unrelated to the traffic stop may occur, however, if the detention becomes a consensual encounter. *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).  As the Tenth Circuit has explained:

> A traffic stop may become a consensual encounter requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.  A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer. Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter. An officer is not required to inform a suspect that he did not have to respond to his questioning or that he was free to leave. Therefore, an unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.

*West*, 219 F.3d at 1177 (citations and quotations omitted).

The government contends that the encounter between defendants and Salas became consensual at the time Salas requested consent to search. At that time, Salas returned Davis' driver's license prior to issuing the warning citation to Gill.  He then returned all of Gill's documents, including the purchase agreement and citation.

Although Salas did not show an overbearing display of authority, the court cannot conclude that defendants would have felt free to leave.  At the time Salas returned Gill's documents, he told Gill that he was waiting for information to return on Davis.  Gill was present when Salas received that information.  Salas' request to search the vehicle at the same time that he returned the documentation did not make it appear that the detention was over.  Therefore, the court does not conclude that the detention became a consensual encounter.

Even though the court finds that the encounter had not become consensual at the time Salas asked Gill and Davis for consent to search the vehicle, the evidence establishes that Salas had developed reasonable suspicion that defendants were engaged in criminal activity. "An investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity." *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997)(quotations omitted).

In assessing whether Trooper Salas could have formed a reasonable and articulable suspicion of criminal activity, this Court is not to base its decision on any one factor, but rather, on the "totality of the circumstances." *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995). Deference is to be given "to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

*Id.* (citing United States v. Cortez, 449 U.S. 411, 418 (1981)).  In developing reasonable suspicion, an officer is allowed "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273  (2002)

18

(citations & quotations omitted).

Moreover, in the analysis, it is not appropriate for courts to "pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious.  Rather, the reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement officer, justified a brief roadside detention."  *United States v. Doyle*, 129 F.3d 1372, 1376 (10th Cir. 1997).  As such, factors that by themselves are not proof of any illegal conduct may be, when taken together in the aggregate, sufficient to amount to reasonable suspicion. *United States v. Sokolow*, 490 U.S. 1, 9 (1989); *see Arvizu*, 534 U.S. at 277 (finding that factors susceptible to innocent explanation may, when taken together, form reasonable suspicion of criminal activity).

In the instant case, the evidence establishes that Salas was suspicious that the car occupied by the defendants was stolen and being used to transport narcotics.  The vehicle displayed a license plate which had expired in 2001, and an alleged temporary permit that was inconsistent with those with which Salas was familiar.  Gill claimed that he had purchased the vehicle, but did not know the year of the car.  Salas also found Gill's statements about the purchase of the car odd and inconsistent.  Gill and Davis had purchased the car together but did not live together. Gill stated they had purchased the car to make trips between California and St. Louis to visit family.  Gill had borrowed money for the car from Davis and did not know how Davis was employed.  Even though Gill did not have enough money to purchase a car worth approximately $3,000 on his own he had made a trip to St. Louis to visit family only three weeks before a scheduled family reunion.  *See Doyle*, 129 F.3d at 1377 (finding agent had reasonable suspicion to continue questioning defendant and to request permission to search car based on

inconsistent information defendant provided concerning ownership of vehicle).

Moreover, at the time Salas asked for consent to search, the trooper had reasonable suspicion that defendants were transporting narcotics based on the following factors or indicators:

1. The unanswered questions regarding the vehicle's license plate; *see Doyle*, 129 F.3d at 1377;

2. The presence of the air freshener in the car; *see United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir. 1998) (noting that presence of air fresheners contributes to reasonable suspicion);

3. The Visene bottle;

4. Multiple tattoos on Davis' arms;

5. Gill did not know the year of the car which he claimed to have recently purchased;

6. Recent purchase of the car; an indicator of drug trafficking in Trooper Salas' experience;

7. Inconsistencies in information provided by Gill regarding use of the car by Davis; *see United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) (noting that inconsistencies in information can contribute to reasonable suspicion);

8. Gill claimed he had to borrow money from Mr. Davis to buy the car, but was making two long trips to Missouri within three weeks; *see Wood*, 106 F.3d at 947 (inconsistent information; *United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995) (implausible travel plans can contribute to reasonable suspicion);

9. Gill's story about going to Missouri three weeks before did not seem plausible in light

of the family reunion scheduled for three weeks later; *see Kopp*, 45 F.3d at 1453-54;

10. The lack of information Gill had about Davis' employment in light of his claim they were cousins and that he had borrowed money from Davis;

11. The claim that the family reunion in St. Louis was being held at a convention center, something that Salas did not find plausible;

12. Other statements about the reunion that did not seem consistent with a family gathering including the fact that neither Gill nor Davis had their children with them;

13. Davis' refusal to provide an entire social security number;

14. Davis' criminal history which showed prior arrests for armed robbery and drugs; *see United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994) (stating that prior criminal history in conjunction with other factors contributes to reasonable suspicion);

15. Davis' false statement that he had only been arrested only for fighting; *United States v. Santos*, 403 F.3d 1120, 1132-33 (10th Cir. 2005) (finding that when individual lies about having criminal history, inference of wrongdoing is all the more powerful);

16. Vehicle was registered to an unknown third party, Deborah Nay, ; *see Villa-Chaparro*, 115 F.3d at 802 (fact that a defendant is driving a car registered to someone else has been found to contribute to reasonable suspicion of criminal activity); and

17. Defendants were driving on a known drug pipeline.

The Tenth Circuit has found reasonable suspicion of criminal activity in similar situations.  For example, in *United States v.  Santos*, 403 F.3d 1120, 1133-34 (10th Cir. 2005), the court found reasonable suspicion based on nervousness, implausible and inconsistent accounts of travel plans, and defendant's lying about his prior criminal history. *See also United States v.*

*Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (finding reasonable suspicion based on nervousness and inconsistencies between the defendant's appearance and his stated occupation); *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993) (finding officer had reasonable suspicion of criminal activity based on defendant's failure to respond to question regarding the registered owner and nervousness); *United States v. Arango*, 912 F.2d 441, 447 (10th Cir. 1990) (finding reasonable suspicion based on defendant's failure to provide credible proof he lawfully possessed truck combined with inadequate amount of luggage for two-week trip).

Based on the undisputed facts in the record, the totality of the circumstances, and the established case law, Salas had reasonable and articulable suspicion to believe that the defendants were engaged in illegal conduct. As such, Salas could lawfully detain defendants and request consent to search the vehicle. *See United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997).

## II.  Defendant's Standing to Object to the Search

A defendant who moves to suppress evidence has the burden to show, by a preponderance of the evidence, that he was personally aggrieved by an alleged search and seizure.  To establish standing, the test is whether "the individual manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable."  *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).  Important considerations in the expectation of privacy equation include ownership, lawful possession, or lawful control of the premises searched. *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978).

To establish standing to challenge the search of a vehicle, a defendant bears the burden of

showing he had a "legitimate possessory interest in or lawful control over the car." *Allen*, 235
F.3d at 489. When the defendant is "the car's driver but not the registered owner, mere
possession of the car and its keys does not suffice to establish a legitimate possessory interest."
*United States v. Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). "Rather, at a minimum, the
proponent bears the burden of establishing 'that he gained possession from the owner or
someone with authority to grant possession.'" *Id.* (quoting *United States v. Arango*, 912 F.2d
441, 445 (10th Cir. 1990)).

In assessing whether a defendant has met his burden, courts have looked to the following
factors: 1) whether the defendant asserted ownership over items seized from the vehicle; 2)
whether the defendant testified to his expectation of privacy at the suppression hearing, and 3)
whether the defendant presented any testimony at the suppression hearing that he had a
legitimate possessory interest in the vehicle. *Hocker*, 333 F.3d at 1208; *Allen*, 235 F.3d at 489.

In applying those factors to the instant case, Defendants told Salas that several of the
items in the vehicles belonged to them. They also presented Salas with a bag of marijuana
during the stop. Defendants had a purchase agreement in their name and provided Salas with an
insurance card for the vehicle. Although their ownership of the car was called into question
because the VIN on the vehicle did not match the VIN on the purchase agreement, the
discrepancy is only one digit. It is somewhat unusual that the car had not been registered in their
names under either VIN given that the purchase agreement showed that a registration fee had
been paid and the dealership should have registered the car. However, the court recognizes that
defendants may not have not been able to follow up on that registration since their arrests.
Nevertheless, the court finds that the defendants have presented enough evidence to establish a

legitimate possessory interest in the vehicle and to establish standing. *See Hocker*, 333 F.3d at 1208; *Allen*, 235 F.3d at 489.

### III.  Consent to Search of the Car

Because the court finds that defendants have standing to object to the search of the vehicle, the court must determine whether, under the totality of the circumstances, defendants freely and voluntarily consented to the search. *See Bumper v. North Carolina*, 391 U.S. 543 (1968). The government bears the burden of proof on this issue. *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

As a general rule, the Tenth Circuit has found consent to be voluntary when there is no evidence of coercion and the testimony establishes that consent was freely given, even when a defendant is in custody.

> It appears [the officer] did not unholster his weapon, did not use an insisting tone or manner, did not physically harass defendant, and no other officers were present. Further, the incident occurred on the shoulder of an interstate highway, in public view. [The officer] sought permission specifically to look in the trunk, and defendant got out of the car and opened the truck himself.  Defendant makes no contention that he misunderstood [the officer's] request; any such claim is precluded by defendant's act of opening the trunk. Thus, defendant's consent was unequivocal and specific.

*Soto*, 988 F.2d at 1558 (10th Cir. 1993); *see United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir. 1993); *see also United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004) (finding defendant consented because no assertion that officer touched defendant, threatened him, displayed weapon or spoke in an aggressive tone); *United States v. Ramstad*, 308 F.3d 1139, 1146 (10th Cir. 2002) (holding that consent voluntary); *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000) (finding consent voluntary because no threats made, no cajoling or demand

for consent); *United States v. Anderson*, 114 F.3d 1049, 1064 (10th Cir. 1997) (concluding that consent voluntary because no indicia of coercion).

Here, the evidence establishes that Salas did not coerce the defendants in any way.  As an initial matter, the tape establishes that the stop was on a public highway during broad daylight and Salas was accompanied only by one other trooper who was not standing with Salas at the time Salas asked for consent to search from either Gill or Davis.  At the time Salas asked Gill for consent to search, Salas had returned all of Gill's documents to him.  The videotape establishes that Salas used a normal tone of voice in speaking with Gill and made no threats.

Similarly, when Salas asked Davis for consent, he had previously returned Davis' driver's license to him.  At the time of the request for consent to search from Davis, Salas was standing outside the car occupied by Davis, on the passenger side. The videotape establishes that Salas used a normal tone of voice in speaking with Davis and made no threats. The tape also shows that Salas did not touch Davis or draw his weapon.

Although the evidence shows that Davis did ask Salas, "What would you do if I said no," the tape also reveals that Davis made that statement after acknowledging that the car belonged to Gill and that Gill could authorize the search.  Salas also made it clear that Davis could refuse to give consent for the search of his own property. Davis, however, gave Salas consent to search his bag after getting out of the car.

Based on the totality of the circumstances, the evidence demonstrates that there was no coercion.  Defendants were not under duress and understood Salas' request for consent to search. Defendants' consent to the search of the car, therefore, was voluntary and lawful.  *See Rosborough*, 366 F.3d at 1149.

25

**IV.  Probable Cause to Search**

When a drug-trained dog alerts to a vehicle, probable cause arises to search the entire vehicle and any container which could contain narcotics, including the trunk, without a warrant. *United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir. 2004) (citing *United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir. 1994)); *see United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1994).

There is nothing in the record that would call Claudio's reliability into question.  He is a certified drug-detection dog and Salas is a certified dog handler.  Probable cause arose, therefore, when Claudio alerted or indicated on the white box in the back seat of the car.  Claudio's indication constituted probable cause for a search of the entire vehicle and any container where narcotics could be hidden.  Furthermore, although nothing was found in the box, the evidence establishes that Claudio indicated again on the speaker box in the trunk, leading to Salas' complete search of the speaker box.  When Salas was at his vehicle, Gill approached him and handed him a bag of what appeared to be marijuana and told him that it had been in the white box on the back seat before they had been stopped outside of Las Vegas.  The construction of the speaker box also appeared suspicious to Salas.  Based on Claudio's indication on the box as well as Salas' belief that the construction of the box was appeared suspicious, the search of the speaker box was supported by probable cause and was, therefore, reasonable.

**V.  Gill's Statements**

Gill seeks to suppress statements he made to Salas during the traffic stop and while he was being transported by Salas to the Emery County Sheriff's Office.  The government claims that the statements were voluntarily made.  The government, however, recognizes that Salas did

not advise Gill of his rights under *Miranda* after he was arrested and prior to asking him what he thought was in the box.

Gill's answers to Salas' questions during the traffic stop need not be suppressed. Routine traffic stops are not normally viewed as custodial. *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984). Gill's statements after his arrest, however, were made while he was in custody and should have been advised of his rights.

There is no evidence regarding what solicited Gill's statement with respect to Davis' lack of knowledge about the present of drugs and Gill's agreement with a street gang to transport the drugs. Salas testified that he could not recall asking any questions and he had not documented that he had asked any questions. He did not testify that he did not ask any questions, only that he could not recall asking any questions. The burden rests with the government to demonstrate that there was a voluntary, knowing, and intelligent waiver of *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966). Because the government admits that Salas had not informed Gill of his rights under *Miranda* until after the exchange occurred in the car, the court cannot conclude that Gill made any of the statements in the car voluntarily. Accordingly, the court concludes that Gill's statements to Salas while he was being transported to the sheriff's office are suppressed.

### III. Conclusion

Based on the above reasoning, Defendant Davis' motion to suppress is DENIED and Defendant Gill's Motion to Suppress is DENIED in part and GRANTED in part. The statements Gill made to Salas after he was arrested and while he was being transported by Salas to the sheriff's office are suppressed.

Dated this 15th day of February, 2006.

BY THE COURT:

_____
Dale A. Kimball,
United States District Judge